**Samuel OCHS, Plaintiff,**

v.

**Derald H. RUTTENBERG et al., Defendants.**

**Roy SMOLEK, Plaintiff,**

v.

**Derald H. RUTTENBERG et al., Defendants.**

Nos. 75 Civ. 4455–CLB, 74 Civ. 4944–CLB.

United States District Court, S. D. New York.

Feb. 23, 1978.

---

Nemser & Nemser by Stanley Nemser, New York City, for plaintiffs.

Shearman & Sterling by William B. Pennell and William H. Forsyth, Jr., New York City, Schiff Hardin & Waite by Mitchell S. Rieger and Richard J. Hoskins, Chicago, Ill., for defendants.

## MEMORANDUM AND ORDER

BRIEANT, District Judge.

The second above entitled action (hereinafter the *Smolek* action) was filed initially as a class action in the Northern District of Illinois on February 27, 1974. While a motion was pending in that district to declare that the litigation proceed as a class action, the case was transferred to this district pursuant to 28 U.S.C. § 1404(a) by order dated October 29, 1974. While the undetermined class action motion was before me for hearing, but before it had been resolved, and on September 11, 1975, the first above entitled action (hereinafter the *Ochs* action) was also filed in this Court as a class action. The *Ochs* action was assigned to me as a related case, under Local IAC Rule 13.

Thereafter, by Memorandum Decision dated December 2, 1975, the Court directed that the *Ochs* action be maintained as a class action, consisting of the plaintiff and all other shareholders of Pasco, Inc. ("Pasco") similarly situated who tendered their shares to Pasco and to Studebaker-Worthington, Inc. ("Studebaker") and whose shares had been accepted by Pasco and Studebaker pursuant to a joint tender offer commencing July 11, 1973 (hereinafter referred to as the "tender offer"). Excluded from the class were all defendants and members of their immediate family.

Plaintiff Samuel Ochs was designated as class representative, and his attorneys, Nemser & Nemser, Esqs., were designated as lead counsel. The Court declined to authorize the *Smolek* action to be maintained as a class action, but consolidated the two actions for pre-trial and discovery purposes.

The consolidated actions proceeded in accordance with the aforesaid order. Familiarity with all prior proceedings in both cases is assumed.

By the joint tender offer Pasco had agreed to purchase all shares up to and including the first five hundred thousand shares so tendered by Pasco's public shareholders. If more than 500,000 shares, but not more than 1,000,000 shares were tendered, Studebaker agreed to purchase all such shares tendered in excess of the 500,000 shares taken by Pasco, and if more than 1,000,000 shares were tendered, Studebaker was entitled at its sole option, to purchase all or any part of the shares tendered in excess. There were, on July 11, 1973 when the tender offer was first made, a total of 4,718,042 shares of Pasco issued and outstanding, of which Studebaker already owned 2,457,000 shares or 52.1%; Pasco's officers and directors, and officers and directors of Studebaker taken together owned 89,672 shares or 2%. The balance of 2,171,370 shares or 45.9% were understood to be owned by others, including public shareholders. Pasco's stock was listed and traded on the New York Stock Exchange.

The tender offer was extended and finally expired on August 10, 1973. A total of 245,877 Pasco shares were tendered and accepted. These shares were purchased by Pasco and retired.

Pasco's initial business following its incorporation on April 17, 1947 under the name of Pan American Sulphur Company, was the exploration for, mining and sale of sulphur. It operated through wholly-owned Mexican subsidiaries. In 1967 Pasco sold the majority interests in its Mexican subsidiaries, and became an investment company within the definition of the Investment Company Act of 1940. It had by the end of 1971 more than $48,000,000 in cash, marketable securities or equivalent.

On September 23, 1971 a slate of 11 directors had been elected for Pasco, of whom six are claimed to have been designees of Studebaker. The Pasco shareholders voted to amend the certificate of incorporation to increase the directors from six to 11 and to authorize the Board in its discretion to change the nature of Pasco's business so it would no longer be or be deemed to be an investment company as defined in the Act. In the fourth quarter of 1971 Pasco had sold for approximately $20,000,000 in cash its remaining minority investments in the Mexican sulphur production companies.

Commencing in December 1971 and during 1972, Pasco had been engaged in negotiations with Atlantic Richfield Company ("Arco") for the purchase by Pasco from Arco of the Sinclair properties. The Sinclair properties were required to be divested by Arco pursuant to a judgment entered by Judge MacMahon of this Court on August 28, 1970 (*United States of America v. Atlantic Richfield Company and Sinclair Oil Corporation,* 69 Civ. 162, 50 F.R.D. 369).

Pursuant to a letter of intent dated September 21, 1972, followed by an agreement of purchase and sale dated as of December 21, 1972, Pasco acquired the Sinclair properties as a going concern, and Arco effected compliance with the aforementioned judgment of this Court in 69 Civ. 162.

The Sinclair properties may be described as an integrated petroleum business, including crude oil production properties, refineries, pipelines and marketing outlets. Pasco paid $65,000,000 of its own funds, borrowed $12,000,000 under a revolving credit and term loan from certain banks, and made a simultaneous sale of a production payment from Sinclair's petroleum reserves for $80,-000,000.

As a result of the foregoing transactions, the SEC in January 1973 issued an order pursuant to Section 8(f) of the Investment Company Act, declaring that Pasco was no longer a closed-end investment company under that Act.

Against this factual background, the plaintiff charged the defendant Pasco and its officers and directors with violations of Section 10(b) and 14(e) of the Securities Exchange Act of 1934, Rule 10b–5 and made pendent common law claims. The gist of these charges was found in a claim that the offering circular disseminated in connection with the joint tender offer, initially mentioned in the foregoing factual recital, and through which the tenders were solicited, contained material omissions and material misrepresentations, and was otherwise fraudulent. Specifically, it is claimed that the joint tender offer circular failed to disclose the material facts concerning Pasco's intention and attempts to achieve deregistration under the Act; and to purchase the Sinclair properties from a seller under judicial compulsion to divest, thereby creating what the plaintiff terms a "special situation investment," which might otherwise be described as a purchase at a distress sale.

It is also charged in this litigation that the offering circular failed to disclose that Studebaker intended to increase its controlling interest in Pasco to total or near total equity ownership, and that Pasco would ultimately be liquidated or merged in order to realize substantial gains for Studebaker with respect to the Pasco assets. It is also alleged that the Sinclair purchase was a special situation investment, not for continuous controlled business operations, but instead for purchase and intended sale at a substantial profit; and that those effecting the tender intended to purchase shares in excess of 1,000,000 with the purpose of having Pasco "go private."

Studebaker, through its control of Pasco, is charged with having compelled Pasco to join in the joint tender offer, a fact, by the way, which was obvious from the offering circular. Studebaker is charged with having dictated the terms of the tender offer, basing Pasco's participation not on the independent exercise of business judgment by a board of directors of Pasco having only its interests and those of its public shareholders in view. Also, it is said that the offering circular failed to disclose that the Sinclair properties had a greater value than their book value, and that the defendants knew at the time of the offering circular

that there was a "potential and foreseeable international and domestic energy crisis" and foreseeably a "substantial shortage of crude oil" which would greatly increase the value of Sinclair properties.

It is also claimed in this litigation that the offering circular was misleading in other respects not necessary to be set forth at length, and that the defendants manipulated the market price of Pasco stock by setting the joint tender offer price in bad faith and according to terms unfair and unreasonable.

Since the litigation began, there has been the usual pre-trial discovery, concentrating on documentary material and depositions. Written interrogatories were answered and as a result of the pre-trial discovery, plaintiff Ochs and lead counsel in the class action had ample opportunity to ascertain whether or not their charges were substantiated in fact.

Thereafter, plaintiff's lead counsel entered into settlement negotiations with the attorneys for the defendants. The reasoning adopted by counsel in their conclusion to recommend the settlement here proposed is set forth at length and in detail in the affidavit sworn to January 18, 1978 by Stanley Nemser, Esq. These reasons need not be summarized for our present purposes. Implicit in the discussion therein contained is the fact that Pasco seems at all times to have had a working board of directors in which diverse interests and attitudes were represented, and where corporate affairs were deliberated and decided upon, having regard to the perceived interests of the corporation itself, as well as the interests of Studebaker.

The legal theories under which remedies were sought to be asserted for the benefit of the class were never graven in stone. While this litigation was pending, the position of the class was substantially undercut by pronouncements of the Supreme Court limiting the nature and extent of claims which may be prosecuted successfully under the anti-fraud provisions of the federal securities laws. Specifically, four seminal cases, *Ernst and Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *Bangor Punta Corp. v. Chris-Craft Industries, Inc.*, 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124, *reh. denied*, 430 U.S. 976, 97 S.Ct. 1668, 52 L.Ed.2d 371 (1977) and *Santa Fe Industries, Inc. v. Green*, 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977), were all decided after this litigation had been commenced. These reported decisions, the general expressions of views, or *dicta*, therein contained, and the jurisprudential trend which they suggest all indicate that the plaintiff class, were this case to be tried, would experience difficulties with regard to legal theory above and beyond the admitted factual or evidentiary difficulties which proof of the existence of the fraudulent conduct pleaded would require.

Notwithstanding the deterioration which the claims suffered with the lapse of time, settlement negotiations were resumed while the pre-trial order was being prepared under the supervision of our Magistrate.

Under the proposed settlement, Pasco and Studebaker will provide a cash settlement fund of $370,000.00, which after payment of the legal fees and expenses of the action, will be distributed to members of the class, subject to the limitation that each shareholder filing a valid proof of claim will receive no more than $1.50 per share, and less than that if proration among the class members turns out to be necessary because of the number of claims filed.

As noted, the proposed settlement was negotiated at arms length with the assistance of the Magistrate, by experienced counsel, having regard to the factual and legal difficulties faced by members of the class. Under established principles, this Court is not required to substitute its business judgment for that of plaintiff and his counsel, but need only consider whether the settlement is fair and reasonable. In this consideration, the probabilities of ultimate success must be considered, and there is also for consideration the effect, if any, on the class which a rejection of the proposed settlement would have, followed by a defend-

ants' verdict at trial. Also, the law favors compromise of disputed claims, where, as here, such compromises are just and reasonable, and free from any collusion or improper conduct. See, *City of Detroit v. Grinnell Corporation,* 495 F.2d 448 (2d Cir. 1974).

All of the criteria which affect approval of this settlement have been satisfied. Interesting also is the fact that no member of the class has interposed any objection. A number of the members of the class have already filed proofs of claim, although the time within which they may be filed has not yet expired.

The proposed settlement as contained in the settlement stipulation is approved as fair, reasonable, adequate and proper.

The Court will, at the request of counsel, if it is deemed desirable, enter a final judgment now to that effect, preserving jurisdiction over the subject matter and the parties for the purpose of fixing the counsel fees and disbursements and costs of administering the settlement, and also for the purpose of resolving any disputes with respect to particular claims. The matter of fees and disbursements will be considered after the expiration of the claim filing period, March 31, 1978, at which time the actual benefit to the class of the proposed settlement may be evaluated in light of the total claims actually filed. Unless one or more of the parties to this litigation prefer otherwise, the Court will not *require* the entry of a judgment at this time. Since no appearances or papers were received in opposition to this settlement, it is assumed that no member of the class has any standing to appeal. If counsel wish, however, a judgment may be submitted now on notice or waiver of notice.

So Ordered.